402 So.2d 377 (1981)
John William BARFIELD, Appellant,
v.
STATE of Florida, Appellee.
No. 53767.
Supreme Court of Florida.
June 11, 1981.
Rehearing Denied September 8, 1981.
*378 W. Lacy Mahon, Jr. of Mahon, Mahon & Farley, Jacksonville, for appellant.
Jim Smith, Atty. Gen., and Charles A. Stampelos, Asst. Atty. Gen., Tallahassee, for appellee.
PER CURIAM.
Appellant, John Barfield, was convicted of both first-degree murder and conspiracy to commit first-degree murder. After a jury recommendation of life imprisonment, the trial judge imposed the death sentence for the murder conviction and a thirty-year sentence for the conspiracy charge. We have jurisdiction. Art. V, § 3(b)(1), Fla. *379 Const. We affirm both convictions and the thirty-year conspiracy sentence, but reduce the death sentence to life imprisonment without the possibility of parole for twenty-five years in accordance with the jury's recommendation.
This was a murder for hire in which appellant was the middleman who procured individuals to commit a murder from which he was to share in the proceeds of a $400,000 insurance policy on the victim's life. The primary evidence for the state was the testimony of one of two men who participated in the actual killing and a confession made by appellant to his cell mate. This evidence was supplemented by the testimony of two of appellant's former employees who were initially charged in the conspiracy count and certain admissions made by appellant at his initial arrest. Appellant testified in his own defense.
Appellant was charged in this cause with conspiracy to commit the murder of Forrest J. Harris, Jr., in 1976, and the first-degree murder of Harris on April 23, 1977. The relevant facts, as established in the record, are as follows. Ron Garelick, a general life insurance agent and the victim's business associate, obtained a $400,000 insurance policy on Harris' life, naming as beneficiary a jointly-owned Garelick-Harris corporation. Garelick knew appellant as a business acquaintance and solicited his help in obtaining individuals to kill Harris for the insurance money. Garelick offered appellant $125,000 from the insurance proceeds as compensation for arranging the murder. Appellant actually received no funds from Garelick.
In April of 1976, appellant contacted Gerry Sapp and Huey Palmer, two of his former employees, and offered them $10,000 and $25,000, respectively, to kill Harris. They each testified that they refused this offer. A year later, in April of 1977, at a meeting with Ernest Downs, Larry Johnson, and Sapp, appellant offered Downs $5,000 to kill Harris. After Downs accepted, appellant identified the victim's automobile and apartment, and suggested an appropriate location for the killing. Downs enlisted Johnson's assistance to accomplish the murder. At Downs' request, Johnson phoned Harris, identified himself as a party from whom Harris expected a call, and arranged a meeting under the pretense of discussing the importation of drugs. Downs picked Harris up at the predesignated spot and drove to a remote dirt-road location where he had deposited Johnson earlier. As Harris exited the vehicle and approached Johnson, Downs shot Harris four times with an automatic pistol. After both men dragged the body into the bushes, Downs fired another shot into it to make sure that Harris was dead. The body was not discovered until months later, on August 2, 1977, when Johnson, who had been promised immunity, directed the Duval County Sheriff's Department to the skeletal remains. Also on that date, apparently coincidentally, Garelick met with claims representatives in Houston, Texas, concerning the $400,000 life insurance policy. He settled the claim for $35,000. Shortly thereafter, on August 5, Garelick died of a heart attack.
Also on August 5, the sheriff's department took appellant into custody. An officer read him his Miranda rights, but appellant refused to sign the waiver-of-rights form and stated that he would like an attorney. The officer in charge responded, "We will obtain an attorney for you. Is there anything further you want to say?" The officer testified that at this point appellant turned the rights form over and drew a diagram containing six "X's" in which he identified one "X" as the victim, two others as the men who did the killing, and, from the remaining group of three, one "X" as himself and one as the "big man."
While awaiting trial, appellant was placed in a cellblock with another prisoner who was being held for larceny and forgery and was under investigation for a Louisiana murder. Appellant told the cell mate that he had arranged for Harris' murder and that he had worked on it for over a year.
The cell mate later approached authorities with this information and offered to solicit further incriminating statements *380 from the appellant. Subsequent attempts using a concealed electronic recording device were not successful. At the hearing to suppress the statements, the testimony revealed that the authorities made no contact with the cell mate before he approached them with appellant's inculpatory remarks. The trial court suppressed all conversations after that initial contact with the police.
The state failed to list the cell mate as a witness on its supplemental witness lists until January 11, 1978, although it had known of the cell mate's existence since the preceding October. Appellant, however, had listed the cell mate as a defense witness on January 5, 1978, and deposed him on January 11.
In testifying in his own behalf, appellant acknowledged the 1976 meeting with Sapp and Palmer and alleged that the three went to Harris' apartment complex with the intention of killing Harris. Appellant stated that he remained in the car and waited for about forty minutes when Sapp and Palmer returned, saying that there were too many people around to commit the murder at that time. Appellant denied that he made any arrangements with Downs, but acknowledged that Downs did contact him at approximately the time of Harris' murder asking whether Garelick would pay his bills. He confirmed his conversation with police and his diagraming the six "X's" on the back of the rights card, but he identified the "X's" differently, the group of three as Sapp, Palmer, and himself, two more as the victim and the killer, and the single "X" as the "big man." Appellant expressly denied receiving or paying any money to have Harris killed.
The record before the trial judge and the jury showed that the state granted Larry Johnson full immunity in exchange for his testimony. All charges against Huey Palmer were dropped in exchange for his testifying for the state. Gerry Sapp pleaded guilty to conspiracy to commit first-degree murder in exchange for the state's recommendation that he be sentenced to a maximum of five years and that he testify in the state's behalf.
Ernest Downs, the trigger man, was convicted of first-degree murder, and the trial judge imposed the death sentence in accordance with the jury's recommendation. This Court affirmed. Downs v. State, 386 So.2d 788 (Fla.), cert. denied, ___ U.S. ___, 101 S.Ct. 387, 66 L.Ed.2d 238 (1980). In the present case, the trial court had knowledge of Downs' conviction and sentence, but the jury did not.

TRIAL PHASE
Appellant contends that his conviction should be set aside because the trial judge erred in: (1) not disqualifying herself; (2) denying appellant's request to interview the jurors after the trial concluded; (3) failing to suppress the diagram and statements made by appellant at the time of his arrest; (4) not suppressing all conversations between appellant and his cell mate; and (5) failing to grant a trial continuance because the state failed to timely list appellant's cell mate as its witness. We find that the trial court ruled correctly on all of the asserted points. Only the latter three, however, merit discussion.

Diagram and Accompanying Statements
Appellant contends that the diagram and statements made on August 5, 1977, were erroneously admitted into evidence because appellant made them after asking for counsel. The record is clear that police gave appellant Miranda warnings and that he refused to sign the waiver-of-rights form. Immediately thereafter, appellant asked for counsel and an officer stated: "We will obtain an attorney for you. Is there anything further that you want to say?" Appellant responded immediately by turning the rights form over and sketching his view of the murder's participants on the reverse side.
As set forth by the United States Supreme Court in the recent decisions of Edwards v. Arizona, ___ U.S. ___, 101 S.Ct. 1880, 68 L.Ed.2d 378 (1981), and Rhode Island v. Innis, 446 U.S. 291, 100 S.Ct. 1682, 64 L.Ed.2d 297 (1980), the guideline is whether the officer's statement was designed *381 or could reasonably be expected to elicit an incriminating response. In other words, we must determine whether appellant's statement was the intentional result of interrogation or whether appellant initiated and gave a voluntary statement after complete Miranda warnings. We find it was the latter. The officer's answer to appellant's request for counsel was merely responsive and directed as much to personal needs as to any other matter. Given the entire circumstances, it appears that the officer did not intentionally elicit the incriminating diagram and statement, but rather they were uncoerced and the product of appellant's own initiative and free will. The evidence supports the trial court's finding that appellant's actions were voluntary and not the result of a continuing interrogation after a request for counsel.
We recognize that this is a close question and have consequently considered the effect of the diagram's inadmissibility under Edwards if the officer's statement did indeed constitute improper interrogation. Accord, United States v. Womack, 542 F.2d 1047 (9th Cir.1976); United States v. Crisp, 435 F.2d 354 (7th Cir.1970), cert. denied, 402 U.S. 947, 91 S.Ct. 1640, 29 L.Ed.2d 116 (1971); United States v. Priest, 409 F.2d 491 (5th Cir.1969). On the present record, we find that even if the trial court should have excluded the diagram and statements as violative of Miranda, the error was harmless. The questioned evidence was neither the primary evidence against appellant nor essential to the state's case. Appellant's coconspirators, Johnson, Sapp, and Palmer, each outlined appellant's participation in the Harris murder through their trial testimony. Moreover, the state properly presented appellant's other inculpatory statements made to his cell mate, in which he fully admitted instigating this killing. The combined effect of this evidence clearly established appellant's guilt and rendered the diagram and accompanying statements merely cumulative. The trial court's error, if any, was consequently harmless under the principles set forth in Harrington v. California, 395 U.S. 250, 89 S.Ct. 1726, 23 L.Ed.2d 284 (1969).

Statements to Cell Mate
Appellant next contends that the trial court should have suppressed the confession to his cell mate because its admission contravened his sixth amendment right to counsel.
The United States Supreme Court has recently held that statements made to a cell mate acting as a government informant are inadmissible. United States v. Henry, 447 U.S. 264, 100 S.Ct. 2183, 65 L.Ed.2d 115 (1980). In Henry, an FBI agent instructed defendant's fellow inmate to "be alert" for any incriminating statements that defendant might make. The inmate was subsequently placed in defendant's cell and initiated a conversation in which defendant disclosed that he had committed the charged armed robbery. Citing Massiah v. United States, 377 U.S. 201, 84 S.Ct. 1199, 12 L.Ed.2d 246 (1964), the Court held that the conversation was subject to suppression both because the inmate was paid and had elicited the information and because defendant was without the benefit of or opportunity to obtain counsel.
We find that no sixth amendment violation occurred in the instant case. Appellant's cell mate was not paid and was not acting pursuant to government instruction. The police did not even consider the cell mate as a potential informant until he had approached the authorities on his own initiative which occurred after the inculpatory statements had been made to him by appellant. The trial court directly met any potential Henry violation by suppressing all conversations between appellant and his cell mate after the cell mate's initial contact with the police. We conclude that the trial court acted properly by admitting only appellant's unsolicited statements.

Denial of Trial Continuance
Appellant claims that the state's failure to list the cell mate as a witness until the week prior to trial left his counsel with inadequate preparation time, and that the trial court's denying a continuance caused him prejudice. He asserts that the *382 testimony should have been suppressed because the state had knowledge of the cell mate's status in October, yet there was no disclosure until January. Appellant urges further that the trial court failed to make sufficient inquiry into the alleged discovery violation as mandated by Richardson v. State, 246 So.2d 771 (Fla. 1971), and Wilcox v. State, 367 So.2d 1020 (Fla. 1979).
We disagree. While the state may have improperly delayed the listing of the cell mate as a witness, appellant's counsel had deposed the cell mate with regard to the questioned statements and had even listed the cell mate as appellant's witness. The record clearly establishes that the trial court took these factors into consideration and conducted an extensive evidentiary hearing on appellant's motions for suppression and continuance. In denying the motions, the trial judge specifically found that the state's failure to disclose resulted in no prejudice to appellant. Given these circumstances, we reject appellant's assertions and affirm the trial court.

SENTENCING PHASE
This Court has previously determined that it must give great weight to the jury's advisory sentence of life imprisonment. When a trial judge chooses to override the jury and impose the death sentence, the justification must be clear and convincing and, under the circumstances, the jury's recommendation unreasonable. Neary v. State, 384 So.2d 881 (Fla. 1980); Malloy v. State, 382 So.2d 1190 (Fla. 1979); McCaskill v. State, 344 So.2d 1276 (Fla. 1977); Tedder v. State, 322 So.2d 908 (Fla. 1975).
Contrary to the jury's recommendation in the instant case, the trial judge imposed the death sentence, finding no mitigating circumstances and one aggravating circumstance and stating:
The court finds that [appellant] was the moving party to accomplish the murder of the deceased solely for pecuniary gain. The court further finds that although [appellant] was not the actual killer, he was the moving party causing the death of the deceased. The court therefore finds there was not sufficient mitigating circumstances to out weigh [sic] the aggravating circumstance.
From our view of the instant record, the following factors apparently influenced the jury in its recommendation of life imprisonment: (1) Ron Garelick, the murder's mastermind, had previously died; (2) appellant was the middleman; (3) the state granted Larry Johnson, one of the participants in the actual killing, complete immunity; and (4) one codefendant, charged with conspiracy to commit first-degree murder, received a five-year sentence, and another codefendant had all charges dropped in exchange for testifying for the state. Although not before the jury and not set out in the sentencing order, the trial judge knew at sentencing that Ernest Downs, the trigger man, had been found guilty of first-degree murder and sentenced to death.
We have carefully reviewed the trial judge's order and fully recognize her reasons for imposing the death penalty. We find, however, that there was a reasonable basis for the jury's recommendation of life imprisonment under the facts of this case.
For the foregoing reasons, we affirm appellant's convictions and his thirty-year sentence for conspiracy. The death sentence is reversed and the cause remanded with directions to enter an order sentencing appellant to life imprisonment without the possibility of parole for twenty-five years.
It is so ordered.
BOYD, OVERTON, ENGLAND, ALDERMAN and McDONALD, JJ., concur.
ADKINS, J., concurs as to the conviction and dissents as to the sentence.
SUNDBERG, C.J., dissents.